UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Danielle Carter,** | ) | CASE NO. 1:15 CV 1817 |
| | ) | |
| **Plaintiff,** | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| **PNC Bank, N.A.,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendant PNC Bank's Motion for Summary Judgment (Doc. 19). This case arises under Title VII of the Civil Rights Act of 1964 and the Family Medical Leave Act ("FMLA"). For the following reasons, PNC's motion is granted.

**FACTS**

**A. Carter's hiring and training**

On August 22, 2013, PNC hired plaintiff Danielle Carter, an African-American, as a Customer Service Associate ("CSA") at its Warren Village branch office in Cleveland. Carter then applied for an open CSA position at PNC's branch office located in Strongsville, Ohio (the "Pearl Shurmer Branch"). Branch Manager Patrick Vogt interviewed and hired Carter as a

full-time CSA at the branch beginning in July of 2014. Carter reported to Vogt until mid-November, 2014, when Erika Ressler became Branch Manager and Carter began reporting to her.

As a CSA, Carter's job was primarily to handle customer transactions while on the teller line, which included opening and closing customer accounts. Fraud avoidance, using sound judgment, and strictly adhering to PNC policies were all part of her job duties. Carter Dep. at 53-54. PNC trained Carter on its policies and proper procedures for opening and closing accounts, and the policies were available to her on PNC's intranet. *Id.* at 18, 23-24, 43-44. With respect to closing an account that was linked to a debit card, Carter knew that PNC policy required her to take the debit card from the customer, deactivate the card, and destroy it in front of the customer. *Id.* at 23-24, 50-52.

Carter regularly received training on PNC's Code of Business Conduct and Ethics ("Code of Ethics"). *Id.* at 18, 44-47, Exs. 4, 5. The Code of Ethics states that "[s]afeguarding confidentiality is a fundamental obligation for everyone at PNC....Each of us has an obligation to safeguard information and prevent its unauthorized disclosure." *Id.* at 47-48. Carter was aware of PNC's policy regarding the secure handling of confidential information, understood that the Code of Ethics includes protecting customer information, and understood that protecting privacy and confidentiality is an important part of the CSA position. *Id.* at 19, 48-49. Carter knew that if she failed to follow PNC's policies and procedures, including the Code of Ethics, she could be disciplined, up to and including termination. *Id.* at 19, 49.

**B. Carter's FMLA requests relating to her father's health condition**

In late 2014, Carter's father began experiencing medical problems. Carter spoke with Vogt and Ressler about her need to take her father to medical appointments. Ressler Dep. at

2

47-48, 52; Vogt Dep. at 25. Carter then applied for intermittent FMLA leave.[1] Carter Dep. at 91, 161, Ex. 21. PNC asked Carter to submit a medical certification form from her father's doctor in support of her request, which she did. *Id.* at 95, 169-170, Ex. 22.

On November 10, 2014, PNC notified Carter that her certification was missing information regarding the duration of the disability and the frequency and duration of leave requested. It gave her a new form, instructed her to submit the revised certification within seven days, and explained that it would not consider her request without the missing information. *Id.* at 170-172, Ex. 23. Carter had her father's physician fill out the paperwork again and submitted another form. PNC issued Carter a letter on November 17, 2014, informing her that it had denied her request for intermittent FMLA leave because the re-submitted certification form was still insufficient.[2] *Id.* at 162, 174-175, Ex. 25. Ultimately, however, Carter admits that PNC approved her FMLA request, and she took leave intermittently to care for her father. *Id.* at 192, 206-07;

---

[1] Carter also requested medical leave for her own health condition in early September, 2014. Carter originally brought an FMLA interference claim based on her own leave requests and an FMLA retaliation claim. In her brief in opposition to PNC's motion for summary judgment, she expressly conceded that PNC is entitled to summary judgment on her retaliation claim. (Pl.'s Mem. in Opp. at 16 n.94) ("Carter is not disputing summary judgment as to Count III of her Complaint for FMLA Retaliation."). She also did not respond to PNC's motion for summary judgment on her interference claim related to her own leave requests. As such, she has abandoned this claim. *Briggs v. Univ. of Detroit-Mercy*, 611 Fed. App'x 865, 870 (6th Cir. 2015) ("a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in response to a motion for summary judgment"); *Haddad v. Sec't, U.S. Dep't of Homeland Security*, 610 Fed App'x, 567, 568-69 (6th Cir. 2015) ("A plaintiff is deemed to have abandoned a claim when she fails to address it in response to a motion for summary judgment."). Because she is not pursuing these claims, the Court has not included facts relating to her own medical leave.

[2] The resubmitted form was still missing information regarding the frequency and duration of the leave. Carter Dep., Ex. 24.

Compl., ¶ 30. Carter also admits that she returned to her job after taking intermittent leave but states that she was concerned about her job security during the process. Carter Dep. at 219-20.

### C. Carter's discipline and termination

In the first year of her employment, Carter received a verbal warning in March, 2014, for failing to balance her teller drawer. Then, on September 3, 2014, she received a ninety-day probation for significant teller differences. *Id.* at 20-21, 54-55, 98-99. Carter states that the teller differences were because she was working closely with her supervisor, who made several serious mistakes handling a large transaction. Carter Aff. ¶ 31. She claims that the teller differences in her drawer were because her transactions had been mixed in with her supervisor's transactions. *Id.* ¶ 32. But she agrees that the differences in her drawer were a "serious issue" and that PNC's disciplinary policies provided for probation under the circumstances. Carter Dep. at 103-04.

Several weeks later, while Carter was on probation, she mistakenly faxed a customer's credit card application containing the customer's name, address, account number, balance, and other personal information, to a third party outside PNC. *Id.* at 22, 105-106, Ex. 13; Vogt Dep. at 30. On October 21, 2014, Vogt issued her a final written warning for violation of PNC's Code of Business Conduct and Ethics Privacy and Confidentiality Policy. The warning states:

> Due to your violation of the PNC Code of Business Conduct and Ethics Privacy and Confidentiality you are being given a Final Written Warning. This warning will remain in effect for the duration of your employment with PNC. Further violation of these policies may result in immediate termination of your employment with PNC. . . . [B]e advised that a 3rd serious corrective action issue related to any type of performance or conduct incident, on or before September 3, 2015, may result in the immediate termination of your employment.

Carter Dep., Ex. 13.

On October 24, 2014, three days after Carter received the final written warning, she was

again found to be in violation of PNC policy. That day, a customer came into the Pearl Shurmer Branch to close a business account, and Carter was the employee who assisted him. *Id.* at 24-25. Near the end of the transaction, as part of closing the account, the customer gave his debit card to Carter. Carter turned away from the line to shred the card, which she did. Carter Aff. ¶ 36. While PNC's policy is for the teller to shred the card in the presence of the customer, Carter states that in this case, the customer was in a hurry and had already begun to walk away as she was shredding the card. *Id.* at ¶ 37.

Five days later, on October 29, 2014, the customer complained to PNC after someone fraudulently attempted to use his debit card. Carter Dep. at 26-27, Ex. 19 at PNC 111. PNC investigated the incident and Carter's actions when closing the customer's account. *Id.* at 27, Ex. 19 at PNC 110-111. Fraud Investigator Ashley Novak of PNC's Investigative Services Group conducted a preliminary investigation. Novak discovered that Carter had closed the customer's checking account on October 24, 2014, but she had not deactivated his debit card. Novak Dep. at 41-42, 44, 49. Novak also determined that six attempts had been made to use the debit card by a black woman on October 27, 2014, three days after Carter should have deactivated and destroyed it. *Id.* at 90 - 91, Ex. 5; Carter Dep. at 119.

After Novak's preliminary investigation, she informed Employee Relations of the incident, and PNC assigned Senior Employee Relations Investigator Suzanne Shoemaker to the case. Shoemaker Decl., at ¶¶ 3-4. On November 17, 2014, Novak and Shoemaker questioned Carter by telephone about the events of October 24th. According to Carter, Novak and Shoemaker told her that an African-American woman allegedly attempted to use a debit card from the customer's business account to make purchases at a Home Depot, Wal-Mart, and other

5

stores. Carter Aff. ¶ 43. In Carter's affidavit in support of her brief in opposition, she claims that Novak accused Carter of giving the debit card to "one of her black girlfriends." *Id.* at 42. In her deposition, however, Carter admitted that neither Novak nor Shoemaker ever used the phrase "black girlfriends" and that they only used the term "girlfriends." Carter Dep. at 199-200. Carter denied that she had taken the debit card or that she had given it to a girlfriend who might have tried to use it. But she admitted that she had forgotten to deactivate the debit card when she closed the account. Novak Dep. at 66-67; Shoemaker Decl. at ¶ 5; Carter Dep. at 25-28, 113, Ex. 19 at PNC 110-111.

Following the interview with Carter, Novak determined that Carter had not committed theft or fraud. Novak Dep. at 80. PNC's Employee Relations department, however, found that Carter did not follow PNC's procedures when she failed to deactivate and destroy the debit card in the presence of the customer. *Id.* at 84; Shoemaker Decl. at ¶ 6. Because Carter was on a final written warning at the time and had been warned that any further corrective action could lead to immediate termination, Shoemaker recommended termination, and Ressler agreed. Shoemaker Decl. at ¶¶ 7-8; Carter Dep., Ex. 20; Ressler Dep. at 90. Ultimately, PNC terminated Carter's employment on November 21, 2014, because she was on a final written warning and had failed to deactivate the customer's debit card and destroy it in the customer's presence, which PNC determined was a failure to protect a customer's confidential information. Shoemaker Decl. at ¶¶ 7-8; Carter Dep. at 142-144, Exs. 18, 19.

**D. Comments made to Carter during her employment**

Carter cites to several comments made by Ressler and a regional manager, Stephanie Zenir, to support her claims. Specifically, during one of their first encounters, Ressler spoke with

Carter about her health conditions and her future at PNC. During that conversation, Ressler said to Carter, "Maybe this is not the position for you." Carter Aff. ¶ 14. During another meeting with Ressler when the two were speaking about Carter's father's medical issues, Ressler told Carter that she should "look for another position because of your issues." *Id.* ¶ 15. Carter believes that the comments were related to her FMLA leave requests but testified that she does not know whether they related to her requests or to her on-going performance issues. Carter Dep. at 191, 203.

Carter also claims that she was the subject of racist comments by Zenir in late October, 2014. Zenir came to the Pearl Shurmer branch and spoke with Carter and a few other CSAs in the office, some of whom were racial minorities. According to Carter, Zenir told Carter and the other minority employees that they were hired because PNC wanted them to appeal to minority cultures and clientele. Carter Aff. ¶ 26. Carter claims that Zenir made clear that Carter was hired because she was African-American and fit PNC's image to promote diversity. *Id.* at ¶ 27. Carter was offended by Zenir's comment and complained to Vogt about it. In response, Vogt told Carter not to worry about it and that he would look into it, but Carter states that he never did. *Id.* at ¶ 29. Zenir was not involved in any investigation of Carter's actions or any decision to discipline Carter, including her probation, final written warning, or termination. Zenir Dep. at 22-23, 25, 57-58.

On September 5, 2015, Carter brought this action alleging race discrimination in violation of Title VII and the Ohio Civil Rights Act (Counts I and II), FMLA retaliation (Count III), and wrongful interference with her rights under the FMLA (Count IV). This Court dismissed Carter's claim for intentional infliction of emotional distress on December 17, 2015. As noted

7

above, Carter concedes that PNC is entitled to summary judgment on her FMLA retaliation claim and has abandoned her FMLA claim relating to her own FMLA leave requests.

## SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure, as amended on December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R.Civ.P. 56(a).

Rule 56(e) provides in relevant part that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion ... [and] grant summary judgment if the motion and supporting materials—including the facts considered undisputed-show that the movant is entitled to it." Fed.R.Civ.P. 56(e).

Although Congress amended the summary judgment rule, the "standard for granting summary judgment remain unchanged" and the amendment "will not affect continuing development of the decisional law construing and applying" the standard.  Fed.R.Civ.P. 56, Committee Notes at 31.

Accordingly, summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues

of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**LAW AND ANALYSIS**

**I. Race discrimination claims**

Title VII and the Ohio Civil Rights Act prohibit employers from discriminating against an employee on the basis of race. 42 U.S.C. § 2000e-2(a)(1); Ohio Revised Code § 4112.02. The same analysis applies to claims under Title VII and Ohio Rev. Code § 4112.02, so the Court will analyze these claims together. *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660–61 (6th Cir. 2013). To establish a claim of race discrimination, a plaintiff may produce either direct evidence of discrimination or circumstantial evidence that would support an inference of discrimination. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016). Here, Carter relies on circumstantial evidence to show that her termination was based on race. (Pl.'s Mem. in Opp. at 10.)

In a case involving circumstantial evidence, courts use the familiar *McDonnell-Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Jackson*, 814 F.3d at 776. Carter bears the initial burden of establishing a prima facie case, which requires her to prove that: (1) she was a member of the protected class, (2) she was subjected to an adverse employment action, (3) she was otherwise qualified for the position, and 4) she was replaced by someone outside the protected class or a similarly situated non-protected employee was treated more favorably. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004). If Carter establishes her prima facie case, the burden shifts to PNC to "offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Jackson*, 814 F.3d at 776 (quotations omitted). If PNC meets this burden, "the burden shifts back to [Carter] to show that [PNC's] proffered reason was not its true reason, but merely a pretext for

10

discrimination." *Id.* (quotations omitted).

    A. <u>Carter's prima facie case</u>

PNC does not dispute that Carter can prove the first three elements of her prima facie case. It argues, however, that she cannot meet her burden of showing that she was replaced by someone outside the protected class or treated less favorably than a similarly situated non-protected employee. The Sixth Circuit has held that three factors are relevant to determining whether employees are "similarly situated":

> [T]he individuals with whom plaintiff seeks to compare his/her treatment must have (1) dealt with the same supervisor, (2) have been subject to the same standards and (3) have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Jackson*, 814 F.3d at 777 (quoting *Mitchell v. Toledo hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). While a plaintiff need not demonstrate an "exact correlation" with the comparable, the plaintiff and the employee with whom she seeks to compare herself "must be similar in 'all of the relevant respects.'" *Id.* (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1992)).

Here, Carter does not produce any evidence that she was replaced by someone outside the protected class or that any similarly situated employee outside the protected class was treated more favorably. Indeed, she seems to believe that she does not need to produce such evidence to meet her prima facie burden. In her brief in opposition, she states:

> Defendant argues that Carter cannot point to any other non-minority employees who committed a serious infraction yet were not disciplined or terminated; however, this argument misses the point. Rather, at issue is whether Carter committed a serious violation in the first place and more importantly, whether she was targeted in this incident based on her race...Call it racial stereotyping, call it

11

> profiling, or any other synonym, Novak and Shoemaker, during their investigation into the debit card issue, assumed Carter (1) either stole this debit card and used it herself, or (2) gave it to a "black" friend who then attempted these charges...There is no evidence that PNC treated a Caucasian CSA in a similar manner.

(Pl.'s Mem. in Opp. at 11-12). As PNC recognizes in its reply brief, this argument is more appropriately made at the third step of the burden-shifting analysis to show that PNC's articulated reason for terminating Carter was pretextual. Carter cites to an Ohio appellate court opinion, *Holbrook v. Lexis-Nexis*, 862 N.E.2d 892, 898 (Ohio App. 2nd Dist. 2006), as support for her position that she need not produce a non-protected comparator. But the portion of the *Holbrook* opinion on which she relies is addressing pretext. Earlier in the opinion, where the court analyzed whether the plaintiff could meet his prima facie case, it held that he had met his burden of producing evidence of a comparable, nonprotected employee who was treated more favorably. *Id.* at 896-97. Thus, *Holbrook* does not support Carter's position.

Carter's failure to show that she was replaced by someone outside the protected class or identify any similarly situated non-protected employee who was treated more favorably than her is fatal to her claim because it means she cannot meet her prima facie case. *Agrawal v. Montemagno*, 574 F. App'x 570, 577 (6th Cir. 2014) (affirming grant of summary judgment to employer because "Agrawal has not presented evidence from which a jury could conclude that any alleged comparator was treated more favorably than he for similar misconduct"); *Johnson v. City of Clarksville*, 186 F. App'x 592, 595 (6th Cir. 2006) (affirming grant of summary judgment on plaintiffs' Title VI race discrimination claim because of failure to produce evidence of similarly situated comparator); *Nickerson v. Potter*, 102 F. App'x 936, 938 (6th Cir. 2004) (affirming summary judgment on gender discrimination claim because plaintiff did not produce

any evidence of male employees who were treated more favorably); *Young v. Sabbatine*, 238 F.3d 426 (6th Cir. 2000) ("Because Young has failed to demonstrate that he was treated less favorably than similarly situated non-protected individuals, he has failed to make a *prima facie* showing of discrimination and has therefore failed to raise a genuine issue of material fact as to his *prima facie* case.").

  B. <u>Pretext</u>

  Even assuming Carter could meet her prima facie case, her claim would still fail because PNC terminated her for a legitimate business reason, and Carter cannot show that PNC's articulated reason was a pretext for discrimination. PNC's proffered reason for terminating Carter was that, while she was on a final written warning, she failed to deactivate a customer's debit card and destroy it in the customer's presence, which PNC determined to be a failure to protect a customer's confidential information. Carter does not dispute that this is a legitimate business reason but argues that it is a pretext for discrimination.

  To prove pretext, Carter must show "(1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate the employer's action, or (3) that [it was] insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). To carry her burden in opposing summary judgment, Carter must produce sufficient evidence from which a jury could reasonably reject PNC's explanation of why it fired her. *Id.* Carter apparently relies on the second method of showing pretext–that PNC's stated reason did not actually motivate its decision to terminate her. (Pl.'s Mem. in Opp. at 12). This category requires a plaintiff to "admit[ ] the factual basis underlying the employer's proffered explanation and further admit[ ] that such conduct could motivate dismissal." *Chattman v. Toho Tenax Am.,*

13

*Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). The plaintiff rebuts the employer's explanation "by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (citations omitted). "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.*

Here, Carter begins her pretext analysis by arguing that "the 'theft' allegation against [her] was unfounded." Because she was not terminated for theft, this argument is irrelevant to pretext. Next, she argues that she did shred the debit card and that she closed the account before any of the alleged purchases so the customer was not harmed. Carter, though, does not dispute that her failure to shred the debit card in the presence of the customer or her failure to immediately deactivate the account were sufficient causes for termination.[3] Whether or not the customer was harmed is irrelevant to the pretext analysis. This Court may not second guess PNC's business decision to terminate Carter's employment for failing to comply with PNC's policies regarding the handling of confidential customer information while she was on a final written warning. *See, e.g., Treadway v. California Prods. Corp.*, 2016 WL 4073306, at *8 (6th Cir. Aug. 1, 2016) ("Treadway cannot establish pretext simply by questioning CPC's business judgment. This court is not a 'super personnel department' tasked with 'second guessing employers' business decisions.'")*.*

Next, Carter cites Novak's and Shoemaker's questions during the investigation regarding

---

[3]  Indeed, given the method of proving pretext that Carter has chosen, she *must* admit the factual basis for PNC's explanation and that it could be sufficient to motivate termination.

14

whether she had stolen the card herself, sold or gave it to another black female, or knew the individual who attempted the purchases. Carter claims that this questioning shows pretext because there was "absolutely no evidence or reason by PNC to believe that Carter committed any of this conduct." But Carter admitted in her deposition that she was connected to the individual who fraudulently used the customer's debit card by the very fact that she was the last person at PNC to handle the card before the attempted fraudulent charges. Carter Dep. at 120-122, 130, 200-01, 217-18. This fact alone gave PNC sufficient reason to undertake the investigation and ask the questions at issue. And to the extent that Carter rests her argument on the statement in her declaration that Novak and Shoemaker asked Carter if she gave the card to her "black girlfriend," Carter's deposition testimony directly contradicts the statement because she specifically admitted that neither Novak nor Shoemaker ever asked such a question. Carter Dep. at 199-200 ("Q: Did they ever use the term 'black girlfriends'? A: No."). Carter cannot create a genuine dispute of fact by filing an affidavit, after PNC has moved for summary judgment, that contradicts her earlier deposition testimony. *Penny v. United States Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997). Merely asking Carter if she gave the card to one of her "girlfriends" is insufficient to establish that PNC's stated reason for terminating Carter is more likely than not a pretext for discrimination.

      Finally, to the extent Carter relies on Zenir's alleged statement that Carter was hired because she is African American, it is insufficient evidence from which a jury could reasonably reject PNC's explanation of why it fired her. The comment was made weeks before Carter's termination and was unrelated to the debit card incident or Carter's termination. Moreover, Zenir played no role in the decision to terminate Carter.

For these reasons, PNC is entitled to summary judgment on Counts I and II.

**II. FMLA**

The FMLA states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise any right provided [by this Act]." 29 U.S.C. § 2615(a)(1). As noted above, Carter concedes that PNC is entitled to summary judgment on her FMLA retaliation claim and has abandoned her FMLA interference claim to the extent that it is based on her requests for her own medical leave. Thus, the only remaining issue under the FMLA is whether PNC interfered with Carter's FMLA rights by not allowing her to take leave to care for her father.

The Sixth Circuit applies the *McDonnell Douglas* framework to FMLA interference claims. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). To prevail on her prima facie case, Carter must prove that (1) she was an eligible employee as defined under the FMLA; (2) PNC was a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave PNC notice of her intention to take FMLA leave; and (5) PNC denied FMLA benefits to which she was entitled. *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572 (6th Cir. 2007). "Employees seeking relief under the [interference] theory must [also] establish that the employer's violation caused them harm." *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (quoting *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

While PNC originally denied Carter's FMLA leave request, she admits that it ultimately approved the request, that she took the leave she required, and that her job was available to her when she returned. Thus, her prima facie claim fails because she cannot establish the final element. Moreover, even assuming PNC wrongfully denied Carter's request for leave, the claim

16

fails because, by admitting that she took the leave that she required and that she returned to her job, she has identified no harm from the alleged violation. Nor has she cited any authority for the proposition that her concerns about job security constitute the requisite prejudice or harm.

Even assuming Carter could establish her prima facie claim, PNC had a legitimate reason for denying her leave request, and Carter cannot establish pretext. Specifically, Carter's certification form was insufficient, and she did not cure the defects in the form after PNC gave her notice of the defects and an opportunity to cure them. When requested by the employer, an employee must provide a complete and sufficient certification form to the employer. 29 C.F.R. § 825.305(c).  If the employer finds deficiencies in the form, it must give the employee seven days to cure the deficiencies. *Id.* "If the deficiencies specified by the employer are not cured in the resubmitted certification, the employer may deny the taking of FMLA leave." *Id.*; *Kinds v. Ohio Bell Tel. Co.*, 724 Ff.3d 648, 654 (6th Cir. 2013). Here, Carter's original certification form was missing information. After PNC notified her of this deficiency and gave her time to cure the defect, her resubmitted form was still deficient.[4] Therefore, even assuming PNC had denied Carter's leave request to care for her father, it had the right to do so.

Finally, Carter has not produced sufficient evidence that PNC's stated reason for originally denying the leave request was pretextual. As support, she points to Ressler's statements that "maybe this is not the position for you" and that Carter should "look for another position because of your issues." But at the time of the comments, Carter had been placed on probation and received her final written warning. In her deposition, Carter admitted that she did

---

[4]  Carter's conclusory statement in her brief that she "disputes that the paperwork was incomplete" is insufficient to create a genuine dispute of material fact on this issue.

not know if the comments were related to her FMLA leave requests or her ongoing performance issues. A reasonable jury could not conclude from these statements that PNC's explanation of why it originally denied Carter's FMLA leave request was pretextual.[5]

**CONCLUSION**

For the foregoing reasons, Defendant PNC Bank's Motion for Summary Judgment (Doc. 19) is GRANTED.

IT IS SO ORDERED.

                                                       /s/Patricia A. Gaughan
                                                       PATRICIA A. GAUGHAN
Date:   9/22/16                       United States District Judge

---

[5] Ressler's comments do not constitute direct evidence, as Carter argues in her brief. Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008) (quoting *DiCarlo v. Potter,* 358 F.3d 408, 415 (6th Cir.2004)). **"[D]irect evidence ...does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group."** *Id.* **Because Ressler's statements could have been made in relation to Carter's performance issues rather than her FMLA leave requests, they do not require the conclusion that Ressler discriminated against Carter on the basis of the requests. In addition, there is no evidence showing that Ressler had any authority over Carter's requests. Thus, at best, Ressler's comments are stray remarks that are insufficient to constitute direct evidence of discrimination or evidence of pretext.**